FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2005 JAN 27  P 4: 39

MISCELLANEOUS NUMBER
U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| IN RE: | ) |
|  | ) |
| THE MATTER OF | )     05-mc-10042 |
| JACK M. SPITALE | ) |
|  | ) |

## MOTION FOR PROTECTIVE ORDER

The Petitioner, Jack M. Spitale, respectfully moves this Court for a Protective Order relative to the transportation and analysis of mirrored hard drives and other computer media and storage devices that contain images of alleged child pornography that have been provided by the Commonwealth, through the Office of the Middlesex County District Attorney's Office, to the Petitioner's counsel, Edward W. Wayland, and/or to Petitioner's expert in computer forensics, Marcus Lawson of Global CompuSearch, LLC, located in Spokane, Washington, for inspection and analysis. The Petitioner is a defendant in the case of <u>Commonwealth of Massachusetts v. Jack M. Spitale</u>, now pending in the Middlesex Superior Court of Massachusetts, docket number MICR2002-01352. The Petitioner is charged possession of child pornography.

The Commonwealth alleges that the Petitioner possessed images which constitute child pornography on computers in his home. The Massachusetts State Police have, following the issuance of a search warrant, performed a forensic analysis of the defendant's computers and other computer media storage devices including CDs and floppies. The defendant seeks the opportunity to have his expert conduct a forensic analysis of the hard drives of the computers and the related computer media that was seized and subsequently examined by the State Police. An Order on Discovery was entered by Judge Muse in the Middlesex Superior Court on March 18,

2004, with the assent of the District Attorney's Office, authorizing and requiring the production of the necessary computer media, including mirror image hard drives and copies of other media storage devices seized in this case to counsel for the Petitioner and /or Petitioner's expert. A certified copy of Judge Muse's Order is attached hereto and is hereby incorporated herein.

The Petitioner and his counsel are retaining the services of Marcus Lawson, Global CompuSearch, LLC, of Spokane, Washington to serve as defendant's expert in computer forensics and to consult with defense counsel for the preparation of a defense on behalf of Mr. Landau. In order to effectively analyze the computer information obtained by the Commonwealth, Mr. Lawson has indicated to counsel that he must examine the hard drives and any data seized by the police. See his affidavit attached hereto and hereby incorporated herein. Mr. Lawson is aware of, and agrees to abide by, the Order on Discovery entered by Judge Muse relative to securing the items while not in use and complying with the provisions relating to the destruction of the material at the conclusion of the case. The items must be transported to Mr. Lawson for analysis in the State of Washington, which involves transporting the materials across state lines. In addition, Mr. Lawson may transport copies of such materials to Petitioner's counsel, again across state lines.

Due to the potential criminality of transporting child pornography across state lines, a Protective Order is sought for the protection of all involved including Petitioner's counsel, the Middlesex District Attorney's Office, Marcus Lawson, defendant's expert, and Global CompuSearch.

To deny the defense an opportunity to examine the evidence seized by the Commonwealth and which the Commonwealth intends to use in its prosecution of the Petitioner

on serious allegations would clearly violate the Petitioner's rights to Due Process under both the Federal and State constitutions.

WHEREFORE, the Petitioner requests that this court enter the proposed PROTECTIVE ORDER filed herewith permitting the Commonwealth to provide to undersigned counsel and/or Petitioner's expert the items sought in discovery which may contain images alleged to constitute child pornography, and to further permit undersigned counsel and Marcus Lawson, defendant's expert, to transport these materials and/or copies thereof between themselves.

                      Jack M. Spitale,
                      By his attorney,

                      */s/ Edward W. Wayland*
                      Edward W. Wayland (BBO# 632471)
                      Perry, Krumsiek & Wayland, LLP
                      114 State Street, Suite 200
                      Boston, MA 02109
                      (617) 742-9012

Dated: January 26, 2005

## COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| **MIDDLESEX, ss.:** | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT DOCKET NO. MICR2002-01352** |

```
COMMONWEALTH,           )
                        )
         v.             )
                        )
JACK M. SPITALE,        )
                        )
         Defendant.     )
```

### ORDER

The Defendant, Jack Spitale, having filed a motion seeking the copying and transporting of evidence of child pornography for the purposes of examination of that evidence by defense-retained experts, and the matter having been heard, it is hereby ORDERED that:

1. The Commonwealth shall provide to defendant's attorney and/or expert one bit by bit (also known as "mirror image") copy of any computer hard drives seized in this case and copies of all zip or other disks seized in this case, necessarily including any and all child pornography and/or harmful matter, contraband, etc., allegedly contained thereon.

2. In connection with this provision of such copies, Commonwealth will provide it on a compact disk using "EnCase" software and may, if it chooses, further secure the evidence with a password that it will make known to defense counsel or defendant's expert.

3. The bit by bit or mirror image copies referenced above (hereafter the "Mirrors") shall be maintained by defense counsel and/or an expert retained by the defense in accordance herewith and shall be used by counsel and/or the expert solely and exclusively in connection with this case (including trial preparation, trial, and appeals or other related legal proceedings) and for no other purposes.

1

4. The data contained on the Mirrors may be accessed and viewed only by defense counsel, the defense expert, and defense investigators.

5. The Defendant himself shall not, under any circumstances, be permitted to access or view any graphic image file containing actual or alleged child pornography without petition to and further order of the Court.

6. Any computer into which the Mirrors are inserted may be connected to a printer only on the following terms and conditions: that any printer utilized is a local printer, that such printer may be connected only when and as necessary to print non-graphic image files (text files, log files, directory trees, etc.). The Mirrors shall not be inserted into any computer connected to a network. The Mirrors shall not be inserted into any computer with an internet connection.

7. In no event shall any graphic image file containing child pornography or which may reasonably be construed as constituting child pornography, be copied, duplicated or replicated, in whole or in part, onto any external media including, but not limited to, paper, floppy disk, CD-ROM, DAT tape, zip disk, or other media.

8. The Mirrors shall be maintained by defense counsel and/or the defense expert in a confidential setting at all times except when being actively utilized.

9. A copy of this Order shall be kept with the Mirrors at all times.

10. Upon termination of this matter the parties shall meet, agree upon, and execute procedures which will result in the non-recoverable destruction of all data on the Mirrors and on all computers and computer components used to examine such data.

11. Any dispute as to appropriate data destruction will be resolved by this Court.

12. Defense counsel shall be permitted reasonable access to defendant's original computer system for viewing and visual inspection.

13. The government shall make one copy of each image it has printed out from the computer hard drives and/or zip disks seized from Defendant and provide said copies to defense counsel upon request, who shall maintain them subject to the following conditions:

    a. Defense counsel shall not permit any person to examine the copies except for defense experts and investigators;

    b. No additional copies of the copies shall be made.

14. Transfer of these items by the Commonwealth to defense counsel and/or its experts, Global CompuSearch LLC in Spokane, Washington shall be deemed duties consistent with their lawful discharge of their roles as law enforcement agents and as expert witnesses and shall not subject them to prosecution of any laws deeming such actions to constitute criminal offenses.

Dated: March 18, 2004

_____
Hon. Christopher J. Muse, Justice
Middlesex Superior Court

MIDDLESEX, ss.    **Commonwealth of Massachusetts**
SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT

In testimony that the foregoing is a true copy on file and of record made by photographic process, I hereunto set my hand and affix the seal of said Superior Court this Twenty Seventh day of January, 2005

_____
Assistant Clerk

## COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, SS.:**  SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
DOCKET NO. MICR2002-01352

**COMMONWEALTH,**                )
                                 )
        v.                       )
                                 )
**JACK M. SPITALE,**             )
                                 )
        **Defendant.**           )

### AFFIDAVIT OF MARCUS LAWSON

Marcus Lawson, being duly sworn, deposes and says:

1.     I am the President of Global CompuSearch LLC located in Spokane, Washington and have been so employed since August of 2000. Global CompuSearch LLC provides consulting, forensics and training services on legal issues related to computers and the Internet. The consulting work the company provides offers a special emphasis on sex crimes and child sexual abuse/child pornography issues involving the Internet.

2.     Prior to the creation of Global CompuSearch I was employed as a Special Agent with the United States Customs Service for twelve years. Previous to my employment with the Customs Service, I was employed as a Special Agent with both the Drug Enforcement Administration and U.S. Secret Service for five years. My education consists of a Bachelor of Science Degree in Administration of Justice from Portland State University and a Juris Doctor from Pepperdine University School of Law. During my employment with the United States Customs Service I investigated and worked as an undercover operative in cases of fraud, narcotics, weapons violations, terrorism and child pornography. Investigating child pornography crimes as a Special Agent with the federal government was my chief area of responsibility from 1989 until I left the government in August of 2000. The investigation of this offense via the Internet by use of computers was my chief area of responsibility as an agent from approximately 1995 to August of 2000. For eleven of the twelve years I was a Special Agent with the Customs Service I specialized in the investigation of child pornography and child sexual abuse cases.

3.     During my employment with the Customs Service I both received and provided training in the area of child pornography, the sexual abuse of children, and the behavior of pedophiles. I received training from the Customs Service, the United States Department of Justice, and other federal, state and local law enforcement agencies. I received instruction on investigations of child sexual exploitation from the Customs Service as well as training in the use of computers to obtain and distribute child

pornography both from the Customs Service and SEARCH, The National Consortium for Justice Information and Statistics, Sacramento, California. I personally coordinated the Northwest Child Exploitation Conference on behalf of the Customs Service and served as an instructor in undercover techniques and case studies in the field of child exploitation and child pornography crimes.

4.   During my period of employment with United States Customs, I both coordinated training seminars and trained at seminars coordinated by others, training federal, state and local law enforcement personnel in Oregon, Washington, Idaho, California, Utah, Montana, Alaska, Indiana and Michigan, the United States Attorneys Office, the Federal Public Defenders Office, the American Probation and Parole Officers Association, the Naval Investigative Service, the Federal Bureau of Investigation, the United States Postal Inspection Service, the United States Customs Service Cyber Smuggling Center and dozens of social service providers and community service groups. In 1996 I created one of the first investigative manuals in use by law enforcement investigators and prosecutors outlining investigative techniques and strategies on the Internet. I assisted in the inception, planning and creation of the U.S. Customs Cyber Smuggling Center in 1997. I have also testified before the Oregon State Legislature on issues pertaining to the drafting of child pornography legislation. During my period of employment with the Customs Service I represented U.S. Customs child pornography investigative efforts in numerous print media and television interviews including NBC Nightly News, The Montel Williams Show and BBC Television.

5.   During my employment with the United States Customs Service I personally coordinated four undercover child pornography sting operations and initiated child pornography and/or child exploitation investigations throughout the United States and the world. I coordinated these types of investigations with the Royal Canadian Mounted Police, Scotland Yard, the German Polizei, Naval Investigative Service, Army Criminal Intelligence Division, the Federal Bureau of Investigation and scores of state and local police agencies. I personally investigated hundreds of child exploitation (child pornography/abuse) cases and was associated with approximately one hundred arrests either directly as a case agent or indirectly as a case consultant.

6.   As President of Global CompuSearch I continue to receive requests by both law enforcement and criminal defense entities for training on computer crime issues. As a result, since leaving the employ of the government I have conducted training with sheriffs departments, police departments, state and federal parole officers associations, state and federal public defenders, state and federal public defenders investigators and private citizens groups.

7.   As President of Global CompuSearch I continue to investigate allegations of Internet crime. Since becoming a private consultant I have conducted computer forensics examinations on literally hundreds of computer hard drives and other pieces of media, advising attorneys on my findings and often comparing these findings with the reports of law enforcement forensics investigators. I am also the chief forensics examiner for Global CompuSearch and as such, review the findings of other forensics examiners

employed by Global CompuSearch. Global CompuSearch is an independent consulting firm and while the case load consists primarily of criminal defense issues, neither I nor my employees are defense advocates but rather act as factual advisors to the attorneys in these cases.

8.  I have been recognized as a state, federal and international expert witness in the following areas: Internet undercover techniques, Internet child exploitation investigations, computer evidence in Internet investigations, pedophiles and pedophile behavior.

9.  The term "child pornography," as used in this declaration refers to visual depictions of minors engaged in sexually explicit conduct. The terms "minor," "sexually explicit conduct," "visual depiction," and "production," as used in this declaration, are defined in Title 18, United States Code, Section 2256, et seq. The term "computer", as used herein, is defined in Title 18, United States Code, Section 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

10.  In February of 2004, I was contacted by Mr. Edward Wayland, Esq. the attorney tasked with the representation of Mr. Jack Spitale, the defendant in the instant case. I was asked by Attorney Wayland to advise in the preparation of the defense of Mr. Spitale, to include a forensics examination of the computer evidence collected by law enforcement.

11.  The examination and review of computer digital evidence is unlike any other type of evidence examination. It almost always involves the review of enormous amounts of data and often requires the use of multiple forensics tools to do so. Because computer evidence is by its nature digital, and digital evidence is fragile, such evidence requires special forensics software tools for examination as well as the knowledge of how to use them correctly. Hence, computer evidence is virtually always examined in a controlled laboratory environment by trained personal using specialized investigative software.

12.  Indeed, the following paragraph is taken from an affidavit filed by FBI Special Agent Scott McMillion in support of his request for a Search Warrant on December 21, 2001. It is a paragraph that is reproduced in virtually every affidavit in support of a request for Search Warrant filed by the FBI: (Referring to computer examinations for evidence in child pornography cases) "This is a highly technical process requiring expert skill and a properly controlled environment, and can take weeks or months, depending on the volume of data stored . . . **It would be impractical to attempt this kind of data search on site.**" This request for Search Warrant was approved and signed by the Honorable Thomas Thalken, United States Magistrate Judge, District of Nebraska.

13. Likewise in another recent case handled by my office, the Texas Court of Appeals found reversible error when the State refused to provide a mirror copy of the defendant's hard drive for **independent** review stating: "In so holding, we disagree with the State's position that such a review must be conducted at a State-controlled facility. We would not require a chemist to take a "porta lab" with h8im or her into an evidence room to check alleged contraband drugs, and it is not appropriate to require a computer expert to carry his or her equipment into a State facility to review the documents." (2002 WL 31318065, Clayton Taylor v. State of Texas)

14. In cases involving allegations of criminal misconduct, computer evidence is examined by trained law enforcement examiners, as was done here. It is the job of these police examiners to forensically examine the computer evidence given them looking for, and documenting, evidence of the criminal violation. Rarely (if ever) do police technicians examine this same evidence for exculpatory data that would assist the defense. Rather, if such evidence exists, it is deemed the responsibility of the defense team to find and document it.

15. It is vitally important for the defense team to have the same access to the evidence in this case that the prosecution team has had and continues to have. The computer forensics process must take place in a prescribed manner that guarantees the integrity of the media and the findings. It can also take considerable time and cannot necessarily be done with any stated time constraints as it is impossible to know the extent of the number and size of files available which may confirm or deny the allegations.

16. A thorough, adequate and accurate forensics examination of this or any computer media requires the use of a sterile examination machine and often times multiple forensics tools. Some tools are more useful and thorough in their examination of specific areas of the computer than others. Some forensics softwares are more appropriate in the recovery of text dialog than they are for graphic images and some graphic image softwares are better than others in recovering specific files from specific locations in the computer. In other words, the examination of computer data for evidentiary purposes is a dynamic process requiring multiple tools and substantial time. It is also a basic tenet of computer forensics work that the examination take place on a machine designated for that purpose and that machine not be contaminated with any other data.

17. This company uses specially constructed machines built in house for all examinations, regardless of the type or size of media. These machines are equipped with the tools we have found necessary to quickly and efficiently do computer forensics examinations on a wide platform of operating systems and Internet applications. The machines are consistently updated with new forensics tools and hardware making them not only "cutting edge" in terms of technology, but also very expensive. Whereas initially employees of this firm traveled throughout the country to do examinations, it became quickly apparent that our forensics machines did not "travel well" and invariably had technical (and sometimes even physical) problems as a result.

18.     It is unreasonable to expect myself (or any other competent computer examiner) to bring such machines and my entire forensics laboratory to a police proscribed location and then complete a detailed thorough examination of the computer media under any kind of time constraint that would be financially and practically reasonable.

19.     Most importantly however, it has been my repeated experience that in preparing for trial, the forensics examination process is dynamic on both sides, regardless of the amount or size of the media in question. As issues are raised by both sides in the release of discovery, the claims of either must be verified or refuted by the experts. This can only be done by the defense if the defense expert has the ability to have repeated "as needed" access to the forensics copy of the computer media. It has also been my repeated experience that when that equal access is denied to the defense team, the prosecution is quick to exploit this in the court room and it is often presented to the fact finder as a lack of knowledge or preparation, when in reality, the defense has simply not had the same access to the media as the prosecution team. In the experience of this firm, this issue is the fundamental reason why our policy is not to travel to do examinations and remains our policy regardless of the type of media or its volume.

20.     These two overriding reasons, (1) the need to do examinations on our controlled, sterile and prepared machines in our own controlled lab environment and (2) the continuing need to assess the media at the attorney's request in the days leading up to trial are fundamental issues that apply across the board whether we are examining 200GB hard drives or 3" by 5" floppy diskettes. The recognized principles of forensics examinations of contraband media are consistent, regardless of the size or volume of the media.

21.     It is also important that the defense copy be an actual "mirror" or bit for bit copy of the original. Any manipulation of the original, such as the replacement of charged images with innocuous ones will cause a host of changes not just with the images charged but with the data in nearby sectors. Additionally, the individual images themselves are important to examine from both a subjective viewpoint in terms of their level of lasciviousness and/or age of the participants as well as an objective viewpoint in terms of identification of their Internet origin. In essence, it is a basic tenet of computer forensics examination that both sides examine identical copies of the media because without duplicate copies, it is not possible to offer accurate conclusions of findings.

22.     As noted in the accompanying Curriculum Vitae, I am very familiar with the proper handling of computer evidence of this type. During my employment with the federal government, and now as a private forensics examiner I was, and am, entrusted with the handling and evaluation of computer evidence in child pornography/sex abuse cases on many occasions. My office regularly receives computer hard drives and other media in these kinds of cases accompanied by federal and/or state court orders from courts across the United States. With 15 years of government and private work in this field, it is not unreasonable to assume that I likely have at least as much experience in the proper handling of evidence in child pornography cases as the other law enforcement personnel currently involved in this case.

23.     Regarding the physical security of the copied evidence, Global CompuSearch LLC specializes in the evaluation of computer evidence for litigation purposes. As such, all computer media is handled in a traditional law enforcement evidentiary manner. Global CompuSearch LLC secures all such media in its digitally secure safe between examinations with the appropriate court order attached. Evidence is removed from the safe only for evaluation and returned immediately upon any cessation of forensics work. As is this company's regular practice when receiving media in child pornography cases, I request any drive(s) or other media to be marked by the technician making the forensics copy and such drive(s) are wiped upon completion of this case and returned to law enforcement for wipe verification. Media is shipped to this office from the law enforcement entity making the copy, with an accompanying court order attached, via FedEx. As a firm, we have chosen FedEx for the shipping of media because of their superior package tracking system and because in my prior experience shipping and receiving contraband media such as this as an agent of the government, I know that the government routinely uses either FedEx or UPS for this purpose. This procedure has been this firm's method of operation since our inception and this office has received and examined scores of computer hard drives containing child pornography contraband.

24.     In many cases handled by this firm, the government has previously conceded that contraband can be safely reviewed in our computer lab. In particular, The United States Attorney's Office for the Western District of Washington now routinely stipulates to this firm's possession of contraband media for examination in these cases.

25.     In those cases where release of media discovery was objected to by the government, and that media was subsequently received by this office via court order, there has *never* been an issue of loss or misuse of contraband.

26.     The following list of cases are those in which court ordered media discovery was safely and properly handled by this firm:

### Child Pornography Court Orders Awarded

| | |
|---|---|
| CA v Christian Kacher | YA 049747 |
| CA v David Westerfield | SCD165805 |
| CA v John Scott McClintock | SCD162444 |
| CA v Kendell T. Ontko | M01910070-2 |
| CA v Kurtis Brinkerhoff | VCR168128 |
| CA v Roman Montiel | FC-196731 |
| CO v Peter K. Dunn | 02 CR 5218 |
| CT v George Russell | CR01-74313 |
| MA v Randolph Roberge | 0167 CR 2089 |
| MA v Richard Landau | 2002-286-001/005 |
| NJ v Sean Fitzgerald | 01 1944 |
| NY v Alexander Bueno-Edwards | 03-1106 |
| NY v Brian Manzulo | 203-2002 |

| | |
|---|---|
| NY v Warren Seper | 03-0869 |
| OR v Steven Eric Gelhardt | 0003613CR |
| US v Anthony Donadio | CR03-40007 |
| US v Chance Rearden | CR 01-825-SVW |
| US v David Michael Hill | CR 02-1187-DDP |
| US v Dennis Peterson | CR01-5294FDD |
| US v Fallon Woodland | CR 01-2003 JF |
| US v James Edward Lee | CR-F-02-5301 OWW |
| US v Jeffery Scott Kuzdzal | CR 03-12 Erie |
| US v Jeffrey Brian Zeigler | Case No. not yet known |
| US v John Lester | CR02-6002FDB |
| US v Kenneth King | CR02-0376L |
| US v Loren Samuel Williamson | CR 02-60017-AA |
| US v Michael Aaron Wilson | CR02-6065FDB |
| US v Robert Tashbook | CR 01-20160 JF |
| US v Ssgt David T. Puckett | Order and Stipulation |
| US v Thomas M. Schnepper | 02-00062 HG |
| US v Thomas Salinas | CR 01-1029-AHM |
| US v Wilson-Rutan, Andrew G | Order dated 29 APR 2003 |
| WA v Harjana Kioe | 03-1-00006-4 |
| WA v James P. Degroff | 02-1-0960-7 |
| WA v Thomas Lee Witkoski | 02-1-03514-2 |

Note that this list is not all inclusive and does not include the numerous non-child pornography criminal cases that this office handles including, at last count, five homicide cases three of which are/were capital murder cases.

27. As I have repeatedly explained in Declarations, testimony and in person, this office never, under any circumstances, screen captures or reproduces child pornography (or anything even closely resembling such) at any time or for any reason. The court orders which have allowed us to possesses mirror images of hard drives containing child pornography contraband have always specifically stated this, but even if they had not, this would be the policy of this office. In fact, regardless of the nature of the pornography in question (i.e., adult pornography) it is still the policy of this office to not make screen captures or otherwise duplicate pornography of any kind.

28. It appears that the law enforcement entities in the instant case are using the popular forensics software EnCase. As an added level of precaution, it is possible for the law enforcement technician to make a password protected EnCase case file copy of the media in this case as the duplicate copy sent for analysis. A password protected EnCase case file can only be opened by EnCase software on an examination machine using an EnCase security dongle and by an examiner who knows the appropriate password. In essence, it is not a "copy" such that anyone other than a forensics technician using EnCase, a security dongle and knowing the password would be able to open or observe it. In other words, the data information on the drive is securely locked in an EnCase case file and can not be opened under any circumstances until it is received by this office, where it

is then kept in a digitally secure safe. Even there the data remains locked in the password protected EnCase case file and can not be accessed by anyone except by myself during times of analysis. Subsequently, following the resolution of this case, the media will be wiped of the EnCase case file and returned for verification. This method of transfer virtually eliminates any possibility of anything occurring to the drive, or the data thereon, except for my analysis of it using EnCase software. It also negates any contention that any contraband on the drive is somehow being "duplicated" as the contraband is not viewable to anyone other than myself, using EnCase forensics software, an EnCase security dongle and the appropriate password. With the drive wiped of the EnCase file and returned for verification following the resolution of the case there is no duplication of contraband and no possibility for inadvertent loss or other misuse.

29. This firm prides itself, and in reality is based on, its honesty, its independence and its sensitivity to both the protection of children as well as the protection of the rights of accused persons. We inform defense counsel of all the facts we uncover, both good and bad. This Declaration is offered to the court with no other motive than attempting to insure that both sides in these cases have equal access to the evidence in question and arrive at the truth.

SIGNED PURSUANT TO THE PAINS AND PENALTIES FOR PERJURY THIS 17th DAY OF MARCH, 2004.

Marcus Lawson, President
Global CompuSearch LLC